## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EMMANUEL NOEL                  : CIVIL ACTION
                               :
     vs.                       :
                               : NO. 06-CV-2673
THE BOEING COMPANY             :


## DECISION

**JOYNER, J.**                                    **May 7, 2008**

This Title VII action was tried non-jury before the undersigned on July 24, 25, 26 and 31, 2007.  The parties have submitted their proposed factual findings and legal conclusions and the matter is now ripe for adjudication.  Having carefully considered all of the evidence, we now make the following:

## FINDINGS OF FACT

1.  The Plaintiff is Emmanuel Noel, an adult individual residing at 7038 Reedland Street, Philadelphia, Pennsylvania. (N.T. Vol. I, 9-10).[1]

2.  Plaintiff is an African-American who was born in Port-au-Prince, Haiti and emigrated to the United States in 1980 at the age of 17. (N.T. Vol. I, 9-10).

3.  Defendant is the Boeing Company, a Delaware Corporation

---

[1]  For ease of reference, the Volumes of the Notes of Testimony shall be referred to as follows: Vol. I for July 24, 2007, Vol. II for July 25, 2007, Vol. III for July 26, 2007 and Vol. IV for July 31, 2007.

licensed to do business in the Commonwealth of Pennsylvania with a place of business located in Ridley Park, Delaware County, Pennsylvania.  The Boeing Company designs and manufactures aerospace products.  At the Ridley Park complex alone, Boeing employs between 5,600 and 5,800 people.  (Plaintiff's Amended Complaint and Defendant's Answer thereto, ¶s2-3; Joint Stipulation of Facts, ¶s 1-2; N.T. Vol. II, 172).

4.  At its Ridley Park, Pennsylvania facility, the Boeing Company manufactures helicopters, specifically the CH-47 Chinook and the fuselage for the V-22 Osprey, primarily for the United States Department of Defense.  (N.T. Vol. II, 172; Joint Stipulation of Facts, ¶3).

5.  Following his graduation from high school, the plaintiff obtained an FAA air frame and power plant license after graduating from the Quaker City aviation school.  By securing that license, Plaintiff was certified to work on airplane frames. (N.T. Vol. I, 10-11; Joint Stipulation of Facts, ¶5).

6.  Plaintiff began working for Boeing at the Ridley Park facility on June 18, 1990 as a sheet metal assembler.  At the time of his hire, Plaintiff was a Labor Grade 5 assigned to Shop 3710 working on the Chinook 47.  In that position, Plaintiff's primary job duties included aircraft repair and installation of components.  (N.T. Vol. I, 12-13; Joint Stipulation of Facts, ¶s6-7).

2

7.   The terms and conditions of the plaintiff's employment are governed by the Collective Bargaining Agreement ("CBA") between Boeing and the International Union of United Automobile Aerospace and Agricultural Implement Workers of America (UAW) Local 1069.  In addition, the Boeing Company also has policies and procedures governing equal employment opportunities and harassment in the workplace, has an annual Ethics Re-Commitment Day, requires all of its employees to sign a Code of Conduct, and all of its managers to undergo a one-time training course on EEO matters.  (N.T. Vol. I, 14-19, 158; N.T. Vol. II, 172-175; Exhibits P-22, P-23, P-54, P-55).

8.   Under Section 10 of the CBA, promotions are to be given at Boeing as follows:

> When openings occur in higher labor grades and there is no employee with a prior right to such job classification, they will be filled on the basis of skill and ability being the determining factors, with seniority being given full consideration and prevailing when skill and ability are equal.  Selection of available qualified employees for openings that occur will be in the following sequence:
>
> a.  From within the next lower job classification within the job occupation within the seniority unit.
>
> b.  From within the next lower job classification within the non-interchangeable occupational group within the seniority unit.
>
> c.  From among the employees who have filed a written request therefore.  No employee may have more than eight (8) total requests on file at any one time.  Such requests will not be considered until five (5) days after the date of filing.  Any employee not selected pursuant to this paragraph shall be so advised promptly.

> Any employee who fails to file a Promotion, Lateral or
> Demotion Request within five (5) days prior to the
> sign-off date of any Review List shall not be
> considered for such opening.
>
> d.  From among those employees who have filed a
> Reactivation Request in accordance with Section 11 of
> this Article.
>
> e.  Lacking available qualified employees under the
> above procedure, the Company will fill such openings by
> hiring new employees.

(Exhibits P-22, P-23).

9.  In 1991, Mr. Noel was promoted to the position of aircraft assembler.  In that position, his primary duties involved the installation of component parts, wiring, and swaging (attaching) hydraulic tubes together.  (N.T. Vol. I, 14).

10.  Mr. Noel worked as an aircraft assembler on the Chinook aircraft until 1995, when he was assigned to work on the V-22 Osprey.  At that time, he was a Labor Grade 7.  He continued to work as an aircraft assembler on the V-22 until he was laid off as part of a company-wide layoff beginning on March 1, 1996. (N.T. Vol. I, 20-21; Joint Stipulation of Facts, ¶8).

11.  That layoff lasted for 22 months, during which time the plaintiff obtained a diploma for computer repair and worked for a New Jersey company called Enacom doing computer configuration and software installation.  When he returned to Boeing in early December, 1997, Mr. Noel was returned to the position of aircraft assembler on the Chinook project at the Ridley Park plant.  (N.T. Vol. I, 21-22; Joint Stipulation of Facts, ¶s8-9).

4

12.   In February 2001, Plaintiff took his first off-site assignment at another Boeing facility in Shreveport, Louisiana where he worked on Chinook as an offsite mechanic. (N.T. Vol. I, 22-23).  Although unclear as to the exact duration, it appears that Plaintiff remained in Shreveport for approximately 6 months.

13.   An off-site assignment is attractive because it affords employees an opportunity to make more money in that off-site workers are paid at a greater labor grade, have more overtime work available, and are given a per diem.  In addition, they often have the opportunity to learn how to perform other jobs. (N.T. Vol. I, 24, 26, 116-117, 147, 194-195).  Individuals volunteer their names for an Offsite Assignment List for consideration when there are openings for off-site assignment. (Joint Stipulation of Facts, ¶13).

14.   In November 2002, Plaintiff was given an off-site assignment as an aircraft mechanic working on modifications to the V-22 at the Bell Helicopter facility in Amarillo, Texas as part of a Boeing-Bell joint venture.  Concomitant with that assignment, Plaintiff's Labor Grade was raised from a 7 to an 8 and he received a per diem of $57 per day.  (N.T. Vol. I, 62-65, 97, Vol. II, 176-178; Joint Stipulation of Facts, ¶12).

15.  Article VIII, Section 13 of the CBA governs the selection and treatment of employees working off-site.  That section further provides in pertinent part:

> The parties recognize and agree that it is impracticable to conduct outside field operations with all senior employees and that seniority alone cannot be the sole determining factor for assignment to outside field operations. Therefore, the Company will make such assignments from the [offsite] list, giving appropriate consideration to the seniority of the employees within the job classifications required for the assignments and to the manpower requirements in the plants.

(Exhibits P-22, 71; P-23, TBC 000035).  Thus, under the CBA, seniority alone is not the sole determining factor for selection for offsite assignment.  (Joint Stipulation of Facts, ¶15).

16.  Due to customer preference and a desire for efficiency, Boeing preferred to assign employees to do offsite work in Amarillo who had acceptable levels of experience in the V-22 Osprey program.  (Joint Stipulation of Facts, ¶16).

17.  Also pursuant to the CBA, employees who were needed for other tasks at the Ridley Park facility and placed on a "production hold" were not eligible for offsite assignment and also would be bypassed in the event of a layoff so that the essential work could be completed.  Although Boeing needed Aircraft Assemblers in May, 2002 to work off-site at the Bell Helicopter facility in Amarillo, Texas to perform modification work on V-22 helicopters, at the time of the May, 2002 requisition, Plaintiff was on a production hold.  (Joint Stipulation of Facts, ¶s 12, 17, 18).

18.  Upon Plaintiff's arrival in Amarillo, his immediate supervisor was Coni Roush.  Ms. Roush remained his supervisor for

6

the next seven months, at which time Juanita Torres became his
immediate (first line) supervisor.  Ms. Torres, who has been
employed by Boeing for some 20 years, the last 9 of which as a
first line manager, is a Hispanic female.  (N.T. Vol. I, 63; Vol.
III, 3-5).

19.  At the time that Plaintiff began working off-site at
the Bell Helicopter facility in Amarillo, other employees from
the Ridley Park facility in his job classification (Aircraft
Assembler/Offsite Mechanic) were also working there, all of whom
were white including Chris Carlin and Gary Newman, who were lower
in seniority than Plaintiff.  Chris Carlin began working in
Amarillo on June 21, 2002; Gary Newman began working in Amarillo
on December 12, 2002.  (Joint Stipulation of Facts, ¶s 20-26);
N.T. Vol. I, 66, N.T. Vol. III, 33-34, 70-71, 91-92).

20.  As of November 5, 2002, the date that Plaintiff left
Ridley Park to go off-site to Amarillo, he was a Labor Grade 7
earning $25.55 per hour in Philadelphia.  Upon arrival in
Amarillo, Plaintiff was re-classified to a Labor Grade 8 offsite
mechanic A earning $26.11 per hour.  Within two weeks, although
he remained as a Labor Grade 8, his pay increased to $28.75 per
hour. (Exhibit P-40).

21.  Before they went to Amarillo, both Chris Carlin and
Gary Newman were also Labor Grade 7.  As of December 6, 2002,
when he left Philadelphia, Gary Newman was earning $23.67 per

7

hour as an aircraft assembler.  (N.T. Vol. III, 119).  Like
Plaintiff, upon beginning their offsite assignments, both Chris
Carlin and Gary Newman were reclassified from aircraft assemblers
to offsite mechanic A at Labor Grade 8.  (Joint Stipulation of
Facts, ¶ 42).  While in Amarillo, Messrs. Carlin and Newman
received per diems of between $60 and $66 per day.  (N.T. Vol.
III, 81, 118).

22.  Both Chris Carlin and Gary Newman were promoted to
Offsite Mechanic General, Labor Grade 11 within 7 months of their
arrival in Amarillo.  Prior to his promotion on October 9, 2002,
Chris Carlin was earning $29.83 as an Offsite Mechanic A.  Gary
Newman was earning $28.37 as an Offsite Mechanic A prior to his
promotion on July 11, 2003.  Carlin and Newman's promotions were
limited to Amarillo; the Amarillo promotions would not have any
permanent effect on their labor grades or positions if they were
to return to Ridley Park. (Joint Stipulation of Facts, ¶s 43-48).

23.  In 2003, Plaintiff had filed a lawsuit under Title VII
against Boeing and one of its managers, Randy Illum, alleging
employment discrimination on the basis of race and national
origin.  With the exception of John Hilaman, who learned of that
suit in preparation for his testimony in this case, none of
Plaintiff's co-workers or immediate supervisors had any knowledge
of that earlier action.  (N.T. Vol. I, 142, N.T. Vol. III, 11-12,
N.T. Vol. IV, 19).

24.    In September, 2003, Plaintiff complained about Newman and Carlin's off-site promotions via letter and/or e-mail to union representative James Johnson and Boeing Labor Relations representative Donald Hudson, and by verbally complaining to John Hilaman.  (N.T. Vol I, 72-75, N.T. Vol. IV, 59-60, Exhibits P-101, P-103).   Despite receiving no response to these complaints, Plaintiff did not file a formal grievance or an EEO/EEOC complaint until March 25, 2005.  (Exhibit P-115).

25.    Plaintiff was not well-liked by his Boeing co-workers in Amarillo.  Specifically, Gary Newman, Bill Tackas, Richie Todd and Steve Gwinn called him such names as "asshole" and "mother fucker," and threatened him.  On at least one occasion, Gary Newman called him a "fucking Haitian," and told him to "go back to your country."  Although Plaintiff complained to Juanita Torres, she took no action.  (N.T. Vol. I, 76-82, N.T. Vol. III, 93-96, 101-107).  For her part, Torres professed to having no recollection of Plaintiff ever complaining to her about discriminatory or threatening comments directed to him by his co-workers, although she did notice that Mr. Noel had little to do with his co-workers outside of the workplace.  (N.T. Vol. III, 54-59).

26.    Plaintiff did not have a good relationship with Juanita Torres either.  In addition to not taking any action to address his complaints about his co-workers, Ms. Torres

frequently followed him around the job site, pushed him as he was
leaving a classroom one day, would look him up and down and wrote
him up for eating in the cafeteria one day on company time and
for insubordination for not immediately returning to the factory
floor.  (N.T. Vol. I, 79-83, N.T. Vol. III, 7-11; Exhibit D-49).
Although the Employee Report was, pursuant to the Collective
Bargaining Agreement, to be automatically expunged from
Plaintiff's personnel file 10 months after its filing, it appears
that the Employee Report which Plaintiff received from Ms. Torres
for insubordination was not purged from his file until April 10,
2007 subsequent to Plaintiff's filing a grievance with the union.
(Exhibit D-44A; N.T. Vol. I, 187-191).

     27.  On the weekend of July 4, 2004, Juanita Torres told Mr.
Noel that the Boeing Company was not working and would be closed
for the weekend.  As a consequence, the plaintiff stayed home and
did not go into work at all that weekend.  While several other
Boeing employees also were off the entire weekend, the Bell
Helicopter facility was open, the Bell employees were working and
Wes McKinney, Chris Carlin and Gary Newman, who were at that time
in the same job classification as the plaintiff (Offsite
Mechanics) each worked six hours at the overtime pay rate on July
3, 4, and 5, 2004.  Vince Kashnoski, another offsite mechanic,
worked six hours on July 3rd.  (N.T. Vol. I, 90, N.T. Vol. III,
60-62; Exhibit P-52).

28.  Although the Plaintiff filed a grievance through the
union over having been bypassed for overtime on July 4, 2004,
Boeing denied the grievance for the reason that there was no
available work for Plaintiff's job classification that weekend.
(N.T. Vol. I, 91-96; Exhibit P-52).

29.  Plaintiff's Amarillo offsite assignment was extended
several times, often at the last minute.  (N.T. Vol. I, 191).  In
an internal e-mail dated February 18, 2004, Juanita Torres
expressed the need to further extend the offsite assignments of
Bill Tackas, Gary Newman, Chris Carlin, Vince Kashnoski, Howard
Gwinn, Richard Todd and Wes McKinney, but indicated that for
"Manny Noel, 4-1-04, you have no need to extend."  With the
exception of the plaintiff, all of the other employees mentioned
in Torres' e-mail were white.  (N.T. Vol. III, 32-34).

30. Several months later in or around September, 2004 with
the modification work nearing completion resulting in a reduced
workload for the Boeing employees, John Hilaman, the Director of
Operations for the Boeing V-22 project traveled to Amarillo to
meet with the employees.  At that time, Mr. Hilaman explained
what was going on with the program and that by the end of the
year, there would be a need for fewer employees at the Bell
facility.  Because none of the employees wanted to leave
voluntarily and the Collective Bargaining Agreement was silent
with regard to the matter, Hilaman decided that they would be

11

returned to Ridley Park on the basis of seniority.  (N.T. Vol. I,
96, 191, N.T. Vol. II, 193-197, N.T. Vol. III, 13-15, 35-37, 73-
74, 96-98; Joint Stipulation of Facts, ¶s50-52).  If, however,
the decision of who to send back to Ridley Park had been based
upon the skills and/or abilities of the individual employees,
Juanita Torres would have had the discretion to return whoever
she wanted to and she would have sent Emmanuel Noel back first to
Ridley Park.  (N.T. Vol. III, 36-37).

     31.  Of the Offsite Mechanics, Gary Newman, Chris Carlin and
Emanuel Noel were the three lowest in seniority and were the ones
designated to return to Ridley Park at the end of the year.
(N.T. Vol. I, 96, 99, N.T. Vol. III, 73-74, 96-98; Joint
Stipulation of Facts, ¶53).

     32.  At or around this same time that fewer offsite
mechanics were needed, Boeing needed additional materials
handlers/offsite support personnel.[2]  In accordance with the CBA,
Boeing ran an offsite list in Ridley Park offering its current
materials handlers the opportunity to go offsite to Amarillo.
However, this resulted in only one of the three available
materials handler positions being filled in Amarillo.  (N.T. Vol.
II, 197-199, Vol. III, 15, 38-40; Joint Stipulation of Facts,

_____

     [2]  The job of material handler was also referred to as an offsite
support person for those employees who were performing the job away from their
home/usual place of employment.  Such temporary offsite job assignments were
otherwise known as "domestic temporary assignments" and/or "field trips."
See, e.g., N.T. Vol. I, 97, N.T. Vol. II, 177-178, 198-200, 214, N.T. Vol.
III, 15, 110).

¶55-56).

33. Part of the job of a materials handler is to order and bring the supplies and parts necessary to support the shop and the mechanics.  For this reason and because a number of offsite materials handlers had to cut short their offsite assignments early and return to Philadelphia, it was common knowledge to the offsite mechanics that there were not enough offsite materials handlers to do the job.  (N.T. Vol. III, 15-18, 73-74).

34. Prior to the exhaustion of the offsite materials handlers' list in Ridley Park, Chris Carlin approached Juanita Torres to express interest in taking a materials handler position in Amarillo if the list was exhausted without success.  (N.T. Vol. III, 16-17, 49-50, 75).  Not knowing whether that could be done because the offsite materials handler job was classified at a lower labor grade than the offsite mechanic's job, Torres and Carlin checked with John Hilaman and Boeing's Labor Relations Department and discovered that so long as the offsite position had first been offered to individuals in that job classification currently working in Ridley Park, if Carlin was willing to accept a lower labor grade to stay in Amarillo, he could do so.  (N.T. Vol. II, 200-202, N.T. Vol. III, 16-19, 73-75, 86-89).

35. Despite the fact that the material handler/offsite support person's position was one labor grade lower than that of offsite mechanic, that position still commanded a higher hourly

13

wage than did the aircraft assembler/aircraft mechanic positions
in Ridley Park.  In addition to the higher hourly wage, there was
a greater opportunity to work overtime and Boeing still paid the
per diem.  (N.T. Vol. I, 193-195).

36. In mid-September, 2004, Chris Carlin began working as a
materials handler in Amarillo.  (N.T. Vol. III, 91, Exhibit D-
59).  Prior to that time, he had been earning $34.68 per hour as
an offsite mechanic general.  When he began working as a
materials handler in Amarillo, Mr. Carlin's rate of pay declined
to $31.32 per hour, although by the end of 2004, he was earning
$32.24 per hour.  (N.T. Vol. III, 83-84, Joint Stipulation of
Facts, ¶s61-63).  Mr. Carlin remained in Amarillo at the
materials handler position until the end of December, 2006.
(N.T. Vol. III, 79-80).

37.  Subsequent to the meeting with John Hilaman, Gary
Newman began inquiring into the rumor that he had heard that
Boeing was still looking for materials handlers.  Mr. Newman
approached Juanita Torres, John Hilaman, Jim Shaw, who was the
Amarillo site manager for Boeing and Steve Ryan, who was then
working as a materials handler in Amarillo and expressed interest
in taking the position.  (N.T. Vol. III, 20-22, 97-99, 112-118).
Ms. Torres and Mr. Hilaman again conferred with the Labor
Relations Department and confirmed that so long as the offsite
position had first been offered to individuals in that job

classification currently working in Ridley Park, if Newman was willing to accept a lower labor grade to stay in Amarillo, he also could do so.  (N.T. Vol. II, 205-208, 212-216, N.T. Vol. III, 20-23).

38.  Following the meeting at which Mr. Hilaman had made clear that the offsite assignments were coming to an end for the three mechanics with the least seniority, Plaintiff began inquiring of both Jim Shaw and Juanita Torres what he could do to stay in Amarillo.  (N.T. Vol. I, 96-99).  Although neither Shaw nor Torres initiated discussions about the materials handlers jobs with either Chris Carlin or Gary Newman, both knew about the need to fill those positions and, in Torres case' that Boeing management was investigating whether it was possible for Newman and Carlin to take those positions without violating the Collective Bargaining Agreement.  Despite this knowledge, in response to Plaintiff's repeated inquiries about what he could do to stay in Texas, Torres told him repeatedly that he would have to return to Philadelphia.  (N.T. Vol. I, 96-100, N.T. Vol. III, 15-23, 98-100, 114-117).  At no time, however, did Plaintiff specifically ask if he could have another job in Amarillo other than the one that he already had as a mechanic.  (N.T. Vol. I, 195-199; N.T. Vol. III, 22-23).

39.  Gary Newman transferred to the offsite materials handler position at the end of December, 2004.  (Joint

15

Stipulation of Facts, ¶66).  As a result, he did not return to Philadelphia and, in fact, was still working as an offsite support person/materials handler there through the trial of this matter.  (Joint Stipulation of Facts, ¶66; N.T. Vol. III, 101; Exhibit D-60).

40.  Immediately prior to transferring to the material handler position in Amarillo, Gary Newman was earning $37.02 per hour as an offsite mechanic general.  As of January, 2005 Mr. Newman was paid at the rate of $31.37 per hour as an offsite material handler.  Currently, he earns approximately $33 per hour in that position and continues to be paid the per diem.  (N.T. Vol. III, 109-110; Joint Stipulation of Facts, ¶s67-68).

41.  Emmanuel Noel returned to Ridley Park from Amarillo at the end of December, 2004.  Upon reporting to work after the Christmas Break on January 2, 2005, he was returned to the job he had left, aircraft assembler earning $26.80 per hour.  (Joint Stipulation of Facts, ¶s 71-72; N.T. Vol. I, 102; N.T. Vol. II, 203-204; Exhibit P-40).

42.  The position of aircraft assembler at Boeing's Ridley Park facility paid nearly five dollars an hour less than the position of offsite material handler in Amarillo.  (N.T. Vol. II, 204-206).  In addition, Boeing no longer paid the per diem allowance once the employee returned home.  (N.T. Vol. I, 102, 116).

16

43.  In late 2004, a number of job openings were identified for additional aircraft mechanics and aircraft electricians at the Ridley Park facility and a promotion review list of employees was generated on December 21, 2004.  Pursuant to the Collective Bargaining Agreement, employees on offsite field assignments are not eligible for promotion in Ridley Park.  The December 21, 2004 review list reflected Plaintiff as still being on offsite assignment and, as a result, he was not considered for promotion at that time.  (Joint Stipulation of Facts, ¶73-75; N.T. Vol. I, 102-103, N.T. Vol. II, 208; Exhibit P-57).

44.  Plaintiff promptly filed a grievance with the union on January 21, 2005 for Boeing's failure to consider him for promotion at that time.  (N.T. Vol. I, 103-107; Exhibit P-49; Joint Stipulation of Facts, ¶76).  Because he heard nothing back from the company or the union in response to his grievance, Plaintiff filed a Charge of Discrimination with the EEOC on March 25, 2005 complaining in, part, that he had not been promoted to Aircraft Mechanic upon his return to Ridley Park.  (N.T. Vol. I, 108-109; Joint Stipulation of Facts, ¶77; Exhibit P-115). Plaintiff also filed, on April 4, 2005, a Complaint with Boeing's EEO department likewise complaining of employment discrimination with respect to, among other things, Boeing's failure to promote him in late December 2004 from aircraft assembler to aircraft mechanic.  (N.T. Vol. I, 110-111; Exhibit P-81).

17

45.   On May 4, 2005, Defendant promoted Plaintiff to the aircraft mechanic's position, retroactive to January 7, 2005 and gave him back pay for that intervening period of time and adjusted his seniority accordingly.  (N.T. Vol. I, 111-115; Joint Stipulation of Facts, ¶s79-83).

46.   With the May 4, 2005 promotion, Plaintiff's hourly wage increased from $26.80 to $27.82.  (N.T. Vol. I, 121; Exhibit P-40).

47.   When Plaintiff returned to Ridley Park, he was placed in Shop 3488 supervised by Harley Reeder.  Plaintiff did not have a good relationship with Mr. Reeder either.  (N.T. Vol. I, 122, N.T. Vol. II, 54)).   Specifically, Plaintiff felt that Reeder was harassing him in that he followed him around, passing by the other, white employees to see what Plaintiff was doing and on one occasion singling him out by redressing him for eating during the morning crew meeting.  It was not at all uncommon for the employees to eat during these meetings and apparently many of the other employees in Mr. Reeder's shop would eat breakfast during and after the crew meetings without any comments or warnings from Mr. Reeder.  (N.T. Vol. I, 122-124, N.T. Vol. II, 61-63).  On at least one occasion, Plaintiff observed Mr. Reeder himself eating a bagel with cream cheese.   (N.T. Vol. I, 124).

48.   Mr. Reeder did not in any way discipline or demote Mr. Noel for bringing breakfast to the meeting nor did the plaintiff

18

lose any pay as a result.  (N.T. Vol. II, 18-19; Joint
Stipulation of Facts, ¶s 86, 88).  Nevertheless, Mr. Noel filed a
grievance with Boeing EEO for the incident.  (N.T. Vol. I, 124;
N.T. Vol. III, 129-131).  As a result of that grievance, Mr.
Reeder was reprimanded for "creating the perception of harassment
of [plaintiff] by singling him out for behavior that was engaged
in by others, without similar repercussions."  (N.T. Vol. I, 125-
127, N.T. Vol. III, 139-141).

        49.  Plaintiff was supervised by Harley Reeder for not quite
one year.  Lou Farah took over the supervision of the first shift
in Shop 3488 in December, 2005.  (N.T. Vol. I, 128; N.T. Vol.
III, 142; N.T. Vol. IV, 4; Joint Stipulation of Facts, ¶89).
Plaintiff likewise did not get along very well with Mr. Farah.
(N.T. Vol. I, 129).  On one occasion during a meeting with John
Hilaman at which Hilaman was discussing how well Boeing was doing
with production and how as a result, employees could expect to be
working there for a long time, Farah turned around and told
Plaintiff "you're not going to make it here; you're out of here."
(N.T. Vol. I, 129-130).  Mr. Farah would also follow the
plaintiff around and forbade him to eat anywhere in the shop.  On
another occasion, Mr. Farah unjustly accused Mr. Noel of taking a
tool from the tool box without leaving a chit,[3] when the tool had

---

        [3]  Because any loose object, including food and tools, can be very
dangerous and can cause damage if left on an aircraft, it is very important
that every tool be accounted for and that no food or other implements be left
onboard.  It is for this reason, that employees are not permitted to eat

actually been removed the preceding weekend by another aircraft mechanic, Patrick Abili, on another shift.  (N.T. Vol. I, 27, 44-48, 131-134; N.T. Vol. IV, 11, 14-16).

50.  Mr. Noel was not formally disciplined as a result of the tool box incident or for eating outside of the designated area; he received no reduction in pay or seniority and he suffered no other or adverse actions.   (N.T. Vol. II, 27-29).

51. Finally, the plaintiff also complains that Mr. Farah had chided him on a number of occasions for leaving the toolbox unlocked.  Employees in Mr. Farah's shop were required to keep the toolbox locked and Farah communicated this need to Plaintiff and the other employees in his shop.  (Joint Stipulation of Facts, ¶s90-91; N.T. Vol. IV, 40-41).  Plaintiff noticed that each time Mr. Farah chided him, another employee, Don Sheldon Wildermuth was always in the vicinity of the toolbox.  Plaintiff believes that Mr. Wildermuth was trying to frame him and he filed a complaint regarding the matter with the Human Resources Department. (N.T. Vol. I, 134-137; Vol. IV, 13-14).  Again, however, Plaintiff was never formally disciplined or otherwise adversely affected by these incidents.  (N.T. Vol II, 20-22;

_____

outside of the designated break areas.  In addition, Boeing's toolboxes are "shadowed," so that the tools have specific foam cut-outs where they rest, thus making it clearly apparent when a tool has been removed.  In a further effort to alleviate Foreign Object Damage ("FOD") and to track each tool's whereabouts, each employee has a designated number of uniquely designed and colored "chits," which he/she is to place in the toolbox whenever he or she removes a tool from the box.  (N.T. Vol I, 45-46, 52-53; N.T. Vol. III, 129-130; N.T. Vol. IV, 9-12).

Joint Stipulation of Facts, ¶92).

52.  In 2006, Mr. Farah had the opportunity to appoint a "lead" or head mechanic in Shop 3488.  The function of the lead mechanic is to help the supervisor and the other mechanics to perform and complete their work.  The job is not recognized under the CBA, is not governed by seniority, and thus it falls within the discretion of the shop supervisor to decide who to appoint to the position.  It pays $.75 more per hour for the individual who is given the job.  Although the plaintiff at that time had 16 years of experience in working on aircraft, Mr. Farah gave the job of lead to Ernie Spence.  (N.T. Vol. I, 137-139; N.T. Vol. IV, 16-17, 38; Joint Stipulation of Facts, ¶s 93, 98, 99).

53.  At the time of his appointment to the lead position, Mr. Spence had been working for the Boeing Company since March 11, 1985 when he began as a Sheetmetal Assembler.  (N.T. Vol. IV, 37; Joint Stipulation of Facts, ¶s 94-95).  He thereafter spent 17 years working in the Transportation Department as a truck driver, fueling and towing aircraft, culling aircraft components from around the work sites, taking aircraft to the airport, loading them into the C-130s, C-117s, and C-5s.  (N.T. Vol. IV 44; Joint Stipulation of Facts, ¶96).  In 2003, Mr. Spence became an aircraft assembler working in Shop 3457 on V-22 and a year later, was promoted to the position of aircraft mechanic when he was transferred to Shop 3488.  (N.T. Vol. IV, 43-44; Joint

Stipulation of Facts, ¶96-97).  Prior to joining Boeing, Mr.
Spence had spent four years in the U.S. Marines Corps as a crew
chief and mechanic working on the CH-46 Sea Knight and six years
as an aircraft mechanic working for a company called Dilech, an
aerospace corporation, at the Patuxent River Naval Air Station.
(N.T. Vol IV, 37-38; Joint Stipulation of Facts, ¶s 101-102).

54.  By all accounts, Ernie Spence is a good mechanic and
Plaintiff acknowledges that factors other than seniority may be
considered when selecting someone for a "lead" position.  (Joint
Stipulation of Facts, ¶s 100, 103; N.T. Vol. II, 29-30, N.T. Vol.
IV, 16-18, 51).

55.  Although Plaintiff complained to his union about Ernie
Spence's appointment, the union advised him that it was not a
union issue.  Plaintiff thereafter took no other actions to
challenge the appointment such as filing a complaint with
Boeing's internal EEO department or a charge of discrimination
with any state or federal agency.  (Joint Stipulation of Facts,
¶s 104-105).

56.  Although Plaintiff was called names such as "asshole"
and "mother-fucker" by a number of his co-workers, the only
comment directed to his race or nationality was that made by Gary
Newman when he called Mr. Noel a "fucking Haitian--go back to
your country."  Plaintiff has no knowledge that any racially or
national-origin-based discriminatory or derogatory comments were

22

ever made by any of his supervisors or managers at Boeing, nor is there any evidence on the record of this matter that any other witness has knowledge that such comments were ever made by any of Boeing's supervisory or managerial personnel.  With the exception of Juanita Torres, Plaintiff did not report or complain about Mr. Newman's comments to Boeing's Human Resources Department.   (N.T. Vol. I, 201-209; N.T. Vol II, 2-12).

57.  Alandis Reeves has been employed at Boeing's Ridley Park facility since 1990, the last twelve years as an aircraft electrician.  Mr. Reeves has been working in the same shop and same shift as Plaintiff since Plaintiff returned from Texas. Plaintiff and Reeves are the only African-American, non-white employees in Shop 3488 out of a total of 13 employees.  Mr. Reeves witnessed Harley Reeder single out and sternly warn Mr. Noel about eating breakfast during the morning crew meeting and is also currently supervised by Lou Farah.  In Mr. Reeves' experience, he has never seen Harley Reeder ever say anything to any of the white employees despite the fact that approximately five of them are eating breakfast during the morning meetings at any given time.  (N.T. Vol. II, 51-63). In addition, Mr. Reeves has been angrily yelled at by Mr. Farah and told to "do us all a favor and go get another job."  Likewise, he has witnessed Lou Farah very angrily yelling at Mr. Noel.  At no time has Mr. Reeves seen Mr. Farah yell at or treat any of the other employees

23

in their shop in the same manner as he has treated he and Mr.
Noel.   Mr. Farah has also purposely bumped into and brushed
against Mr. Reeves in such a way that Mr. Reeves believed that
Mr. Farah was trying to intimidate him.   Again, Mr. Reeves has
not witnessed Mr. Farah engage in this type of conduct around any
of the white employees in Shop 3488.   (N.T. Vol. II, 63-72).

58.   There are no African-American supervisors and only one
African-American manager, Tony Martin, at Boeing's Ridley Park
facility.   (N.T. Vol. II, 89-91, 111).

59.   David Vaughn was also an African-American aircraft
assembler who worked offsite in Amarillo, Texas at the Bell
Helicopter plant commencing in late 2002.   Like the plaintiff,
Mr. Vaughn, who had been employed by Boeing since 1993, was
raised one Labor Grade (from a 7 to an 8) to work off-site.   When
Mr. Vaughn arrived in Amarillo, Mr. Noel was already working
there; they were all working together in the same area modifying
the aircraft.   Although he asked the off-site manager at the
time, Bob Banach, and his then-supervisor, Coni Roush, to be
raised to a Labor Grade 11 and the same per diem as was being
paid to Chris Carlin, Gary Newman and Wes McKinney, Banach
refused, advising him that "[i]t wasn't him.   It was Philadelphia
rejecting it."   (N.T. Vol. II, 83-84, 93-99, 103-104).   Because
he couldn't afford to maintain two households at the Labor Grade
he was being paid, Mr. Vaughn returned to Philadelphia after four

months.  (N.T. Vol. II, 99-100).

60.  In 2002, Plaintiff's salary and wages as reported on his W-2 totaled $58,940.27.  In 2003, he had reported wages and salary of $104,619.18 plus a location specific per diem of $14,306.00.  In 2004, his salary and wages were reported as $91,597.28 and he also received another $20,618 in per diem. (N.T. Vol. I, 144-146; Exhibits P-8, P-9, P-10).  In contrast, for 2005, after he returned to Ridley Park from Amarillo, Plaintiff's reported salary and wages totaled $65,931.35 and he earned $73,295.99 in total salary and wages in 2006.  (N.T. Vol. I, 146; Exhibits P-11, P-12).  Plaintiff works, on average, 8-10 hours of overtime per week in Ridley Park.  He worked an average of 20-25 hours in overtime weekly in Amarillo.  (N.T. Vol. I, 147).

61.  Prior to the events underlying this lawsuit, Mr. Noel suffered from major depression disorder.  In October, 2001, he was transported via ambulance from Boeing's Ridley Park facility to the Belmont Center, a hospital specializing in the treatment of mental health disorders, where he remained for a little more than one week.  (N.T. Vol. I, 148-149; Joint Stipulation of Facts, ¶s 108-109).  Following his release from Belmont, Plaintiff continued to receive daily therapy with a psychologist and social worker at Fairmount and remained out of work from Boeing on a medical leave of absence until February 18, 2002.

25

(N.T. Vol. I, 150; Joint Stipulation of Facts, ¶109).  While an
in-patient at Belmont, plaintiff was placed on Prozac and Celexa
but upon discharge, he was taken off of Celexa and prescribed
Wellbutrin in its place but remained on Prozac.  Mr. Noel was
doing much better and he continued with these medications until
March, 2003 when he discontinued treatment.  (N.T. Vol. I, 151-
152).

     62.  Upon his return to Ridley Park from Amarillo, Plaintiff
was again very depressed.  Nevertheless, it was not until July,
2006 that he began seeing Dr. Mayekar, a psychiatrist.  Dr.
Mayekar diagnosed him with major depression and prescribed
Wellbutrin and Trazodone.  (N.T. Vol. I, 152-153).  He
subsequently began treating with a psychologist, William Korey,
who likewise diagnosed him as suffering from major depression and
post-traumatic stress disorder and referred him to another
psychiatrist, Dr. Ira Herman, for evaluation and medication. Dr.
Herman, in turn, prescribed Prozac and Trazodone.  At the time of
trial, although Mr. Noel was continuing with those medications
and seeing those treatment providers, he was still feeling
"terrible, unhappy, sick, depressed."  He relates his current
emotional state to the manner in which he was treated by his
employer, feeling that Boeing treated him differently than its
white employees, by giving them better pay and opportunities and
not harassing them.   (N.T. Vol. I, 154-155; N.T. Vol. II, 137-

151).  Assuming that all of what the plaintiff had told him was
true, Dr. Korey, also believes that Mr. Noel's post-traumatic
stress disorder and depression were triggered by his experiences
in the workplace.  (N.T. Vol. II, 152-153, 157, 164-165).

## DISCUSSION

In his Amended Complaint, Emmanuel Noel alleges that the
Boeing Company violated both the Pennsylvania Human Relations
Act, 43 P.S. §951 *et. seq*. and Title VII of the Civil Rights Act
of 1964 (as amended), 42 U.S.C. §2000e, *et. seq*. by: (1)
discriminating against him on the basis of his race and national
origin in the terms and conditions of his employment and by
treating him differently than his white, non-Haitian co-workers;
(2) retaliating against him for filing an earlier job
discrimination lawsuit and filing grievances, and (3) subjecting
him to a racially hostile work environment.  We address each of
these allegations in turn.

1.  *Disparate Treatment/ Discrimination*

Title VII specifically proscribes certain employer practices
as discriminatory by declaring:

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any
individual, or otherwise to discriminate against any
individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin;
or

(2) to limit, segregate or classify his employees or

27

applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. §2000e-2(a).

The PHRA similarly provides in pertinent part:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required. ...

43 P.S. §955(a).  Pre-requisite to bringing and maintaining suit in federal court under both the PHRA and Title VII is the timely filing of an administrative charge with either or both the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission complaining of the discrimination.  See, Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997); 43 P.S. §962(b); Delacruz v. Piccari Press, 521 F. Supp.2d 424, 432-433 (E.D. Pa. 2007); 42 U.S.C. §2000e-5.  In the absence of a

28

timely filed charge, the employee may not challenge the discriminatory practice in court.  Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S.Ct. 2162, 2166-2167, 167 L. Ed.2d 982 (2007).

It is of course by now well-established that, in the absence of direct evidence, Title VII and PHRA claims alleging discrimination and disparate treatment[4] are evaluated under the familiar burden-shifting framework first set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and later clarified in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L. Ed.2d 207 (1981).  See, e.g., Witcher v. Sodexho, Inc., No. 07-2166, 2007 U.S. App. LEXIS 21404 at *4, 247 Fed. Appx. 328, 329 (3d Cir. Sept. 6, 2007)(non-precedential); Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005).[5]  Briefly summarized, this analysis proceeds in three stages: first, the plaintiff must establish a prima facie case of discrimination.  Jones v. School District of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) citing McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824.  If the plaintiff

_____

[4]   Under Third Circuit precedent, Title VII and the PHRA are construed consistently.  Schedemantle v. Slippery Rock University, State System of Higher Education, 470 F.3d 535, 539, n. 5 (3d Cir. 2006); Atkinson v. Lafayette College, 460 F.3d 447, 454 n.6 (3d Cir. 2006); Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

[5]   Indeed, a disparate treatment claim comprises two elements: an employment practice and discriminatory intent; the McDonnell Douglas factors establish discrimination by inference.  See, Ledbetter, 127 S.Ct. at 2171.

succeeds in establishing a *prima facie* case, the burden shifts to
the defendant to articulate some legitimate, non-discriminatory
reason for the employee's rejection.  <u>Id</u>.  Finally, should the
defendant carry this burden, the <u>McDonnell-Douglas</u> framework
largely falls away as it has served its purpose and the plaintiff
then must have the opportunity to prove by a preponderance of the
evidence that the legitimate reasons offered by the employer were
not the true reasons but were a pretext for discrimination.  <u>Id</u>.,
citing <u>Burdine</u>, 450 U.S. at 252-253, 101 S.Ct. at 1093; <u>Byrd v.
City of Philadelphia Department of Public Health</u>, Civ. A. No. 05-
2877, 2008 U.S. Dist. LEXIS 28352 at *21 (E.D. Pa. April 7,
2008).  At all times, the ultimate burden of persuading the trier
of fact that the defendant intentionally discriminated against
the plaintiff remains with the plaintiff.  <u>Burdine</u>, 450 U.S. at
253, 101 S.Ct. at 1093.

To establish a *prima facie* case, the plaintiff must
establish: (1) that he is a member of a protected class; (2) that
he was qualified for the position, benefit or opportunity at
issue and (3) that the employer ultimately filled the position
with someone who was not in plaintiff's protected class and/or
that another not in the protected class was treated more
favorably.  <u>Scheidemantle v. Slippery Rock University, State
System of Higher Education</u>, 470 F.3d 535, 539 (3d Cir. 2006);
<u>Black v. SEPTA</u>, Civ. A. No. 05-3411, 2006 U.S. Dist. LEXIS 67792

(E.D. Pa. Sept. 20, 2006) citing Barber v. CSX, 68 F.3d 694, 698

(3d Cir. 1995).

In this case, Plaintiff's Amended Complaint referenced a

number of specific incidents, some of which dated back to 2002.

These included:

(1) Boeing's failure to send him off-site to Amarillo in May 2002 when white, non-Haitian employees in the same job classification with less seniority were being given off-site assignments;

(2) Being written up by Juanita Torres for eating breakfast after 6 a.m., when she allowed white, non-Haitian employees to do so;

(3) Boeing's failure to promote him to Offsite Mechanic General at a Labor Grade 11 rather than Offsite Mechanic A at Labor Grade 8 in the Spring of 2003, along with his white, U.S.-born co-workers;

(4) Returning him to Ridley Park in December, 2004 while permitting Gary Newman and Chris Carlin, who were of lower seniority and not of Plaintiff's protected class to remain in Amarillo;

(5) Failing to include him on the seniority promotions list in December 2004;

(6) Being chastised for eating during a morning meeting by Harley Reeder;

(7) Lou Farah's appointment of Ernie Spence to the position of lead mechanic instead of Plaintiff.

(8) Not allowing him to return offsite to Amarillo, where his white peers were still working at pay rates greater than that which Plaintiff was earning in Ridley Park.[6]

---

[6] In so far as the plaintiff's proposed findings of fact and legal conclusions do not address this claim, we are assuming that the plaintiff is no longer pressing it.  In any event, we would find that it fails as there is no evidence on the record to suggest that, with the exception of the materials handler job which is still being performed offsite by Gary Newman in Amarillo, Texas, Boeing has any other offsite projects or assignments to which Plaintiff

(Amended Complaint, ¶s12-13, 17, 21-22, 25-27).  Because the
failure to send Plaintiff offsite in May 2002 and the failure to
promote him in Amarillo to Offsite Mechanic General in the Spring
of 2003 fell well outside the limitations period when Plaintiff
filed his Charge of Discrimination with the EEOC in March 2005,
this Court granted the defendant's motions for summary judgment
and for judgment on partial findings pursuant to Fed.R.Civ.P.
52(c) as to those claims.  See, e.g., National Railroad Passenger
Corporation v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061, 2072,
153 L.Ed.2d 106 (2002). ("[D]iscrete discriminatory acts are not
actionable if time barred even when they are related to acts
alleged in timely filed charges; each discriminatory act starts a
new clock for filing charges alleging that act and must be filed
within the 180- or 300-day time period after the discrete
discriminatory act occurred.").  See Also, Hanani v. State of New
Jersey, No. 05-3157, 2006 U.S. App. LEXIS 27960, 205 Fed. Appx.
71, 76 (3d Cir. Nov. 9, 2006)("In employment discrimination
actions, the limitations period begins with the 'time of the
discriminatory act, ...'" and "[a] claim accrues in a federal
cause of action upon awareness of actual injury, not upon
awareness that this injury constitutes a legal wrong"), citing
Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386
(3d Cir. 1994) and Miller v. Beneficial Management Corp., 977

---

could be sent.

F.2d 834, 842 (3d Cir. 1992).[7]

We likewise granted the defendant's motion for judgment on partial findings as to Mr. Noel's claim arising out of the failure to promote him to lead mechanic as there was no evidence to rebut Boeing's explanation that Mr. Farah chose Mr. Spence for the sole reason that he was an excellent mechanic with numerous years of relevant experience and that this decision was a proper exercise of his discretion.[8]  Finally, judgment was granted in favor of Boeing as to Plaintiff's claims for damages for the failure to promote in December 2004 and for Ms. Torres' Employee Report because the record clearly evinces that Mr. Noel was

---

[7]   In so doing, we rejected Plaintiff's argument that these claims were all part of a continuing violation of his rights by Boeing.  The application of the continuing violations theory may be appropriate in cases in which a plaintiff can demonstrate that the defendant's allegedly wrongful conduct was part of a practice or pattern of conduct in which he engaged both without and within the limitations period.  McAleese v. Brennan, 483 F.3d 206, 218 (3d Cir. 2007).  Where the discriminatory conduct constitutes a "continuing violation," the statute of limitations begins to run on the date of the last occurrence of discrimination rather than the first.  Evans v. Port Authority Trans-Hudson, No. 04-4062, 2006 U.S. App. LEXIS 4349 at *12 (3d Cir. Feb. 23, 2006). To establish that a claim falls within the continuing violations theory, the plaintiff must demonstrate first, that at least one act occurred within the filing period and, second, that it is "more than the occurrence of isolated or sporadic acts of intentional discrimination." West v. PECO, 45 F.3d 744, 754-755 (3d Cir. 1995) quoting Jewett v. International Telephone and Telegraph Corp., 653 F.2d 89 (3d Cir.), cert. denied, 454 U.S. 969, 102 S.Ct. 515, 70 L. Ed.2d 386 (1981).  In inquiring into the existence of a continuing violation, courts may properly consider (i) subject matter - whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence - whether the nature of the violations should trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.  West, 45 F.3d at 755.  In so far as the failure to give Plaintiff an offsite assignment is factually and legally distinct from the failure to promote him, we found Plaintiff to have been complaining of separate and distinct acts of discrimination rather than an ongoing course of discriminatory conduct.

[8]   Indeed, even Mr. Noel agreed that Mr. Spence's mechanical skills were good.  (N.T. Vol. II, 29-30).

subsequently promoted and given back pay and all relevant
benefits in May 2005 and that the Employee Report was expunged
from his personnel file in 2007 with no other adverse
consequences having been suffered by the plaintiff.  These
holdings notwithstanding, we did determine that these last two
claims could and would be considered in determining whether or
not Mr. Noel has been working in a racially hostile environment.

　　　　We now consider  Mr. Noel's remaining claim that Boeing
discriminated against him by failing to transfer him to the
position of offsite support person/material handler.  In so
doing, we find that Plaintiff has sufficiently established a
*prima facie* case.[9]  First, as a black native of Haiti, Mr. Noel is
obviously a member of a protected class.  Second, as he was then
performing the same job and had the same skill sets as did Mr.

---

　　　　[9] Defendant submits that the plaintiff has failed to establish a *prima
facie* case on this point because he never applied for the position.  By Mr.
Noel's own admission, he knew that more materials handlers were needed in
Amarillo, that a number of materials handlers had come from and subsequently
returned to Ridley Park from Amarillo and that the remaining materials
handlers were having difficulty keeping up with the workload in Amarillo.
(N.T. Vol. I, 192-199). While Plaintiff does not dispute that he never
formally applied for the job or requested a transfer through the union, he
testified that he repeatedly asked Juanita Torres and Jim Shaw if anything had
changed with Boeing's decision to return him to Ridley Park and if there was
anything at all that he could do to stay in Amarillo.  In response to each
inquiry, he was told that John Hilaman had said that there were no more
extensions and that he and Gary Newman would be returning. Although Plaintiff
acknowledged that, toward the end of 2004, he learned that Chris Carlin had
transferred to the materials handler job, when Plaintiff asked his union
representative about it, his union representative told him only that Boeing
could do whatever they wanted.  (N.T. Vol. I, 97-100).   Plaintiff testified
credibly and on the basis of this testimony, we find that he has amassed
sufficient evidence to make out a *prima facie* case.  As discussed *infra*, the
plaintiff's admitted failure to apply for the position is considered as part
and parcel of the defendant's articulated non-discriminatory reason for the
employment decision.

Carlin and Mr. Newman, Mr. Noel was just as qualified for the offsite materials' handler position as were the two, non-protected individuals to whom Boeing did give the jobs.[10]  Thus, we find that by returning Plaintiff to Ridley Park in December, 2004, and not transferring him into the materials handler position, Boeing arguably treated Plaintiff's white, American-born co-workers more favorably than it treated him.[11]

In rebuttal, Boeing asserts that its sole reason for giving Mr. Carlin and Mr. Newman the materials handler positions was because they were the only employees who directly expressed interest in and volunteered for the jobs and that in doing so, it followed the Collective Bargaining Agreement guidelines to the

_____

[10]  Although Mr. Farah, Mr. Reeder, Ms. Torres, Mr. Spence and Mr. Newman all testified that the plaintiff's mechanical skills were not as good as those of other Boeing employees, we note that all of these witnesses are clearly less than dis-interested.  We therefore find the testimony of Messrs. Abili and Vaughn that Plaintiff was just as skilled as any of the other aircraft assemblers and mechanics to be more credible.  Moreover, there is no evidence that mechanical ability has ever been a criterion for the performance of the material handler position.

[11]  Although not raised by the plaintiff's EEOC charge or his Amended Complaint, we also note that much was made at the trial of this matter of the plaintiff's grievance regarding his having been passed over for overtime work in Amarillo on the weekend of July 4, 2004.  While Boeing's and the union's position was that Mr. Noel was bypassed for overtime work because there was no work available for him in his job classification (offsite mechanic), it appears that Mr. Newman, Mr. Carlin, Mr. Kashnoski and Mr. McKinney, all of whom were also offsite mechanics were offered and worked at least six hours of overtime each that weekend.  To the extent that it is Boeing's argument that all of these individuals were actually classified as offsite mechanic general(s) as opposed to offsite mechanic A(s) as was then Plaintiff's classification, we hasten to point out that this only adds further insult to injury given that plaintiff was not included for some unknown reason in the promotions process that took place for what appears to be all of his white co-workers in or around the late Spring and/or early summer 2003.  Given that plaintiff has failed to preserve these claims through the timely filing of a charge of discrimination, however, he cannot be granted any relief based upon them.

letter.  The record evidence supports this assertion.  Ms.
Torres, Mr. Hilaman, and Mr. Hudson all testified that there was
nothing in the collective bargaining agreement which prohibited
an employee from voluntarily assuming another offsite position at
a lower pay grade so long as the position was first offered to
those employees currently in that job classification by running
an offsite jobs listing.   Each of these witnesses further
testified that Boeing ran an offsite list for the material
handler position in Ridley Park on several occasions with only
limited success.  This testimony is uncontradicted and
unimpeached as is the testimony from Torres, Hilaman, Newman and
Carlin that it was Newman and Carlin who initiated the
discussions about the possibility of transferring into those
positions.  (N.T. Vol. II, 198-202, N.T. Vol. III, 16-19, 73-75,
86-89; N.T. Vol. IV, 65-68).  As Plaintiff himself acknowledges,
he never sought to have another job in Amarillo other than the
one which he was then performing - mechanic.  (N.T. Vol. I, 195-
199).  It is axiomatic that to prevail at trial, the plaintiff
must convince us *both* that the reason given by the employer was
false *and* that discrimination was the real reason for the
decision.  See, Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.
1994).  There being no evidence to contradict the foregoing
testimony and no evidence to suggest that Boeing was in fact
motivated by the plaintiff's race and/or national origin to not

36

transfer him into a materials handler position, we must find that Plaintiff has failed to prove his case against the defendant with regard to this claim.  Accordingly, judgment shall be entered in favor of Boeing on Plaintiff's remaining claim of disparate treatment.

    2.  *Retaliation*

Plaintiff's next claim, which is outlined in paragraphs 8-9 and Count III of his Amended Complaint, is for retaliation and emanates from the discrimination law suit which he previously filed against Boeing and one of its supervisors in January, 2003 and from his filing of internal grievances and EEOC complaints protesting Defendant's allegedly discriminatory employment practices.  Again, both Title VII and the PHRA clearly proscribe retaliatory conduct.  Under Title VII, 42 U.S.C. §2000e-3(a):

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The PHRA provision, 43 P.S. §955, is similar:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations

37

established by the United States or the Commonwealth of
Pennsylvania:

> ...

> (d) For any person, employer, employment agency or
> labor organization to discriminate in any manner
> against any individual because such individual has
> opposed any practice forbidden by this act, or because
> such individual has made a charge, testified or
> assisted, in any manner, in any investigation,
> proceeding or hearing under this act.

It has been said that "the anti-retaliation provision of
Title VII protects those who participate in certain Title VII
proceedings and those who oppose discrimination made unlawful by
Title VII." Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d
Cir. 2006); Black v. SEPTA, Civ. A. No. 05-3411, 2006 U.S. Dist.
LEXIS 67792 at *11 (E.D. Pa. Sept. 20, 2006).  Again, given that
the language of the PHRA provision here at issue contains nothing
specifically different from that contained in Title VII, the
implicated provisions of Title VII and the PHRA are to be
interpreted identically and as being governed by the same set of
decisional law.  Slagle v. County of Clarion, 435 F.3d 262, 265
n.5 (3d Cir. 2006).

Claims for unlawful retaliation are analyzed under the same
burden-shifting framework applied to discrimination claims.
Krouse v. American Sterlizer Co., 126 F.3d 494, 500 (3d Cir.
1997); Logan v. Countrywide Home Loans, Civ. A. No. 04-5974, 2007
U.S. Dist. LEXIS 20088 at *32 (E.D. Pa. March 16, 2007).  A *prima
facie* case for unlawful retaliation has three elements: (1) that

38

the employee engaged in protected activity; (2) that the employer took an adverse action against him; and (3) that a causal link exists between the protected activity and the employer's adverse action.  Allen v. AMTRAK, No. 05-4551, 2007 U.S. App. LEXIS 2216 at *8, 228 Fed. Appx. 144, 147-148 (3d Cir. Jan. 31, 2007), citing Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997).

"With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  Moore, supra, citing Slagle, 435 F.3d at 266. "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."  Id., citing Clark County v. Breeden, 532 U.S. 268, 271, 121 S. Ct. 1508, 149 L. Ed.2d 509 (2001)(per curiam).

To make out the second element, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Burlington Northern & Santa Fe Railway Co. v. White, ___U.S.___, 126 S. Ct. 2405, 2415, 165 L. Ed.2d 345

(2006); <u>Hanani v. State of New Jersey DEP</u>, No. 05-3157, 2006 U.S. App. LEXIS 27960 at *24, 205 Fed. Appx. 71, 80 (Nov. 9, 2006).   In recognition of the fact that an employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace, the Supreme Court ruled in <u>Burlington Northern</u> that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."   126 S. Ct. at 2412, 2414.

To establish the third element of the *prima facie* case, a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.   <u>Moore</u>, 461 F.3d at 341-342.   "The 'timing alone' of an alleged retaliatory action may 'be sufficient to establish a causal link,' but only if that timing is 'unusually suggestive' of retaliatory motive."   <u>Logan v. Countrywide Home Loans</u>, Civ. A. No. 04-5974, 2007 U.S. Dist. LEXIS 20088 at *34 (E.D. Pa. March 16, 2007), quoting <u>Krouse v. American Sterlizer Co.</u>, 126 F.3d at 503.   For this reason, cases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action because this is an obvious method by

40

which a plaintiff can proffer circumstantial evidence sufficient
to raise the inference that the protected activity was the likely
reason for the adverse action.  Kachmar, 109 F.3d at 177 citing
Zanders v. National R.R. Passenger Corp., 898 F.2d 1127, 1135
(6th Cir. 1990) and Jalil v. Avdel Corp., 873 F.2d 701, 798 (3d
Cir. 1989).  Where there is a lack of temporal proximity,
circumstantial evidence of a "pattern of antagonism" following
the protected conduct can also give rise to the inference.  Id.

These are not the exclusive ways to show causation as the
proffered evidence, looked at as a whole, may suffice to raise
the inference.  Id.  Generally, it can be said that if at least
four months pass after the protected action without employer
reprisal, no inference of causation is created.  Urey v. Grove
City College, No. 03-2753, 2004 U.S. App. LEXIS 7188, 94 Fed.
Appx. 79, 81 (3d Cir. April 14, 2004).  However, other types of
circumstantial evidence may operate to substantiate a causal
connection, such as where a plaintiff shows inconsistencies in
the defendant's testimony, certain conduct toward others and/or a
refusal to provide a reference for the plaintiff.  Farrell v.
Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  On
the other hand, even a searching inquiry of the record "will not
cure the absence of any evidence that the decision-makers were
aware of the employee's protected activity and were motivated, at
least in part, by a desire to retaliate."  Logan, 2007 U.S. Dist.

41

LEXIS 20088 at *36, quoting <u>Hall v. Pa. Dep't of Corections</u>, No. 02-1255, 2006 U.S. Dist. LEXIS 68670 at *11-*12 (M.D. Pa. Sept. 25, 2006).

If the employee establishes this *prima facie* case of retaliation, the familiar <u>McDonnell Douglas</u> approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." <u>Moore</u>, 461 F.3d at 342, quoting <u>Krouse</u>, 126 F.3d at 500-01.

Again, however, exhaustion of administrative remedies is a prerequisite to suing under Title VII and the PHRA and in ascertaining whether the available administrative remedies have been properly exhausted, we examine the original administrative charge to determine if the retaliation claim may be said to fall within the purview of the allegations set forth in the EEOC claim.  This is because, as was recently observed by our colleague Judge Pratter in <u>Delacruz v. Piccari Press</u>, 521 F. Supp.2d at 433:

> the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. <u>Ostapowicz v. Johnson Bronze Co.</u>, 541 F.2d 394, 398-99 (3d Cir. 1976).  Thus, the ensuing suit is limited to claims that are within the scope of the administrative charge. <u>Antol v. Perry</u>, 82 F.3d 1291, 1295 (3d Cir. 1996).  In other words, "a subsequent civil action

> may only encompass forms of discrimination similar or related to those filed in the EEOC charge." <u>Kresfsky v. Panasonic Communications & Systems Co.</u>, 169 F.R.D. 54, 61 (D. N.J. 1996)....Specifically, "the determination turns on whether there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may fairly be considered explanations of the original charge or growing out of it." <u>Janis v. La-Z-Boy Furniture Galleries</u>, No. 05-2410, 2006 U.S. Dist. LEXIS 10935, 2006 WL 724157, at *5 (E.D. Pa. Mar. 17, 2006).  The court is mindful that "the scope of an EEOC charge should be liberally construed" because "charges are most often drafted by one who is not well versed in the art of legal description." <u>Hartwell v. Lifetime Doors, Inc.</u>, No. 05-2115, 2006 U.S. Dist. LEXIS 6026, 2006 WL 381685 at *17 (E.D. Pa. Feb. 16, 2006) (citing <u>Hicks</u>, 572 F.2d at 964).

<u>In Accord</u>, <u>Brooks v. CBS Radio</u>, Civ. A. No. 07-519, 2007 U.S. Dist. LEXIS 92213 at *23-*24 (E.D. Pa. Dec. 17, 2007).

In application of all of the foregoing and as a threshold matter, we first examine the plaintiff's EEOC charge.  In so doing, we note that with the exception of having checked the box for "yes" and entering the year "2000" in response to the charge form's inquiry "Have you filed an EEOC Charge in the past?" the plaintiff's Charge of Discrimination contains **no language** which in any way suggests a desire on his part to pursue a claim for retaliation or which in any way indicates that Boeing retaliated against him for previously engaging in protected conduct by, *inter alia* filing grievances and a federal lawsuit in 2003. Without a *per se* rule equating a "yes" answer to the prior filing question with a retaliation claim, we simply cannot conceive how the EEOC could have so construed this sole notation as to have included retaliation in its investigation of the plaintiff's

43

charge.[12]  Accordingly, we are constrained to enter judgment in the defendant's favor on Count III of the Amended Complaint for Plaintiff's failure to properly exhaust the administrative remedies available under both the federal and the state statutes.

Furthermore and even giving Mr. Noel the benefit of the doubt that his claim for retaliation as the result of the filing of his prior EEO complaint in 2000 was administratively exhausted, we also cannot find that the plaintiff has succeeded in proving this claim on the merits.  To be sure, while the filing of the prior EEO complaint and resultant federal lawsuit in 2003 was clearly protected activity on the part of Mr. Noel and he arguably suffered an adverse action in that he was returned from his offsite assignment in December 2004, he has not mustered the evidence necessary to enable this Court to find a causal connection between the two.  It appears from the record that Mr. Noel's previous lawsuit was filed in January, 2003 and was closed in February, 2004 against Boeing and his then-supervisor Randy Illum for interfering with Plaintiff's acceptance of an offsite assignment to Shreveport, Louisiana in 2000.  All of the Boeing Company employees and supervisors who

---

[12]  Once again, we borrow from Judge Pratter's decision in <u>Delacruz</u>:

   Our Court of Appeals expressly declined to adopt a *per se* rule that all claims of "retaliation" against a discrimination victim based on the filing of an EEOC complaint are "ancillary" to the original complaint and that therefore no further EEOC complaint need be filed.

<u>Delacruz</u>, 521 F.Supp.2d at 433, n.6, citing <u>Waiters v. Parsons</u>, 729 F.2d 233, 237 (3d Cir. 1984) and <u>Robinson v. Dalton</u>, 107 F.3d 1018, 1024 (3d Cir. 1997).

testified at the trial in this case testified that they had no
knowledge of this prior lawsuit.  While we certainly recognize
that none of these witnesses are properly characterized as
disinterested, there is simply nothing to contradict their
testimony and, given that there are more than 5000 employees at
Boeing's Ridley Park facility and that Plaintiff had been working
on the Chinook (CH-47) at the time of the prior suit in contrast
to the V-22 project at issue in this action, we cannot find the
Boeing supervisors and employees who testified as to this matter
to be incredible.  For these reasons and because the filing and
dismissal of the earlier lawsuit were both temporally remote from
the plaintiff's return from Amarillo (10 months' elapsed between
the dismissal of the suit and plaintiff's eventual return to
Philadelphia), we conclude that the plaintiff fails to make out a
causal connection.


    3.  *Hostile Work Environment*

    Plaintiff's last claim is that through the words and actions
of his co-workers and supervisors, he was subjected to a racially
hostile work environment at the Boeing Company's facility in
Ridley Park and the Bell Helicopter factory in Amarillo, Texas.

    The language of Title VII prohibiting unlawful employment
discrimination "is not limited to 'economic' or 'tangible'
discrimination.  The phrase 'terms, conditions, or privileges of

45

employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed.2d 296 (1993), quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L. Ed.2d 49 (1986); West v. Philadelphia Electric Co., 45 F.3d 744, 753 (3d Cir. 1995). Again, the language of the PHRA dictates that the same analysis be given as that which is given to claims arising under Title VII.  See, Weston v. Pennsylvania, 251 F.3d 420, 425 and n.3 (3d Cir. 2001).

A racially hostile work environment occurs when unwelcome racial conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment.  McKinnie v. Conley, Civ. A. No. 04-932, 2006 U.S. Dist. LEXIS 40124 at *37 (E.D. Pa. June 12, 2006).  In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive working environment.  Weston, 251 F.3d at 426, citing Meritor Savings Bank, 477 U.S. at 65, 106 S. Ct. at 2404-2405.  "The plaintiff must subjectively perceive the environment to be hostile or abusive, and conditions must be such that a reasonable person would have the same perception."

46

Clegg v. Falcon Plastics, Inc., No. 05-1826, 2006 U.S. App. LEXIS 8576 at *12, 174 Fed. Appx. 18, 24 (3d Cir. April 6, 2006), quoting Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 *3d Cir. 1997).

Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. Harris, 510 U.S. at 23, 114 S.Ct. 371. These may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Id. That having been said, the statutes only prohibit severe or pervasive harassment; they do not mandate a happy workplace. Jensen, 435 F.3d at 451. Thus occasional insults, teasing or episodic instances of ridicule are not enough - they do not permeate the workplace and change the very nature of the plaintiff's employment. Id.

A *prima facie* case of hostile work environment requires that a plaintiff show the following five elements: (1) that he (the employee) suffered intentional discrimination because of his race, (2) the discrimination was severe and pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same race in that position, and (5) the existence of *respondeat superior* liability. Allen v. AMTRAK, 228 Fed. Appx.

47

at 146-147, citing Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d
Cir. 2006); Logan v. Countrywide, 2007 U.S. Dist. LEXIS at *40.
See Also, Andrews v. City of Philadelphia, 895 F.2d 1469, 1482
(3d Cir. 1990).   In establishing the fifth element, much turns
on whether the harassers are supervisors or coworkers - if
supervisors create the hostile environment, the employer is
strictly liable but if coworkers are the perpetrators, the
plaintiff must prove employer liability using traditional agency
principles.   Jensen, 435 F.3d at 452, citing, inter alia,
Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118
S.Ct. 2257, 141 L. Ed.2d 633 (1998) and Faragher v. City of Boca
Raton, 524 U.S. 775, 807-808, 118 S.Ct. 2275, 2292-2293, 141 L.
Ed.2d 662 (1998).

    We now examine the record of this matter "as a whole to
decide whether the plaintiff has proved his case." Cardenas v.
Massey, 269 F.3d 251, 261 (3d Cir. 2001).   We do so mindful that
"particularly in the discrimination area, it is often difficult
to determine the motivations of an action and any analysis is
filled with pitfalls and ambiguities..." and that "Title VII
applies to both 'facially neutral mistreatment [and] overt
[ethnic] discrimination' which in sum constitute the hostile work
environment." Id., quoting Durham Life Ins. Co. v. Evans, 166
F.3d 139, 149 (3d Cir. 1999).   In accord, Caver v. City of
Trenton, 420 F.3d 243, 263 (3d Cir. 2005).   In so doing, we find

that there were clearly a number of hostile acts visited upon
Plaintiff.  However, the evidence that these hostilities were
racially motivated is very scant indeed.

For one, there is evidence that a number of Plaintiff's co-
workers in Amarillo - Gary Newman, Bill Tackas, Richie Todd and
Steve Gwinn repeatedly called him an "asshole" and
"motherfucker," and that Mr. Gwinn told Plaintiff that he and the
other workers were trying to get money together to beat him up
and make him leave.  Plaintiff also testified that Mr. Newman
once called him a "fucking Haitian" who "should go back to [his]
country," and that Mr. Tackas and Mr. Todd on another occasion
physically threatened him and put metal "backchips" in his coffee
cup.  Although Mr. Noel said that he reported these incidents to
Ms. Torres, she took no action to either punish the offenders or
to see that such incidents did not occur in the future.[13]  Mr.
Noel further testified that Ms. Torres had once herself
physically pushed him as he was leaving a classroom.  According
to Mr. Noel, the actions of Ms. Torres, Mr. Reeder and Mr. Farah
in formally and informally reprimanding him for eating breakfast
at the morning meetings and/or on company time and for leaving
the toolbox open are further suggestive of a racially hostile

---

[13]   On this point, Ms. Torres testified that she had no recollection of
the plaintiff having ever complained to her about how his co-workers treated
him.  We do find Ms. Torres' testimony to be incredible in this regard given
her obvious dislike of the plaintiff and her grudging acknowledgment that the
plaintiff did not interact with his co-workers outside of the workplace. (N.T.
Vol. III, 54-59).

workplace.

However, these events took place sporadically, over a period of several years and Plaintiff is admittedly unaware of any other disparaging racial or nationality-based remarks that were ever made by any Boeing supervisor or manager or by any of his co-workers with the exception of the one comment by Gary Newman.[14] There is also no written, pictorial, photographic, documentary or any other evidence of racial animus. (N.T. Vol. I, 203-209).   In short, the sole indicia on the record of this matter that the reason for his supervisors' and co-worker's dislike and treatment of him was racially-motived was Plaintiff's testimony concerning the occasion on which Mr. Newman told him he was a "fucking Haitian," who should "go back to your country."  While the evidence is thus clearly sufficient to establish that Plaintiff was disliked and at times intentionally treated poorly and unprofessionally by his co-workers and supervisors, we do not find it to be enough to show the kind of severe, pervasive *racial* discrimination that is necessary to make out a *prima facie* case of hostile work environment.[15]   <u>See also</u>, <u>Moore v. City of</u>

---

[14]   Mr. Newman denied ever making the comment at issue and further testified that he didn't just use this type of language against the plaintiff; rather he would on occasion call other co-workers the same or similar names if they did something that was not to his liking.  While we grant the plaintiff the benefit of the doubt with regard to the "fucking Haitian" remark, we do find Mr. Newman's testimony regarding his treatment of his other co-workers to be quite credible after observing him at trial.

[15]   We obviously do not need to reach the remaining elements; however, it is clear from his own and Dr. Korey's testimony that the plaintiff has suffered greatly from his co-workers' remarks and threats and from the

<u>Philadelphia</u>, 461 F.3d at 349 (quoting <u>Jensen v. Potter</u>, 435 F.3d at 449 to observe that "many may suffer harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.").

In addition, the defendant submits that this claim is barred by virtue of the plaintiff's having failed to avail himself of the internal processes and remedies offered by the Company. Indeed, the caselaw is clear that an employer may defend against a hostile work environment claim by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventative or remedial apparatus. <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 134, 124 S.Ct. 2342, 2347, 159 L. Ed.2d 204 (2004); <u>Allen v. AMTRAK</u>, 228 Fed. Appx. at 147.

Here, the evidence reflects that Boeing had in place a policy against all forms of discrimination and harassment and that it provided training for its managers with respect to this company policy.  (N.T. Vol. II. 173-175).  In addition, Boeing employees can register complaints of discrimination with the Human Resources Department and for employees covered by the

---

hostilities and disparate treatment which Plaintiff perceives he has received from his supervisors and Boeing management. <u>See</u>, <u>e.g.</u>, Findings of Fact Nos. 61-62; <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. at 22, 114 S.Ct. at 370 (noting that "...Title VII comes into play before the harassing conduct leads to a nervous breakdown.")

Collective Bargaining Agreement to their union.  Despite these internal complaint and grievance procedures, Mr. Noel never filed any complaints about his co-workers or his supervisors' harassment with the exception of his verbal reports to Ms. Torres and his filing of grievances over Mr. Reeder's having chastised him about eating during the morning meeting and the failure to expunge the employee report given to him by Ms. Torres.  (N.T. Vol. I, 205-208, N.T. Vol. IV, 69).   For this reason also, we are constrained to find in favor of the defendant on the plaintiff's hostile work environment claim.[16]

In reliance upon all of the foregoing, we now enter the following:

---

[16]   We also note our rejection of the defendant's argument that the plaintiff has failed to timely exhaust his administrative remedies with regard to his hostile work environment claim.  As the Supreme Court observed in National Railroad Passenger Corp. (AMTRAK) v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2073, 153 L. Ed.2d 106 (2002):

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. ... The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. ... Such claims are based on the cumulative effect of individual acts.

Bearing this in mind along with the policy of liberal construction attendant to EEOC charges in general, we find that the language in Mr. Noel's charge Questionnaire that: "I have been discriminated because of my race the discrimination was in the form of harassment and disparaging remarks which created a very hostile work environment. ..." was sufficient to place both Boeing and the EEOC on notice that the plaintiff was seeking to assert a claim for hostile work environment.  See also, Hartwell v. Lifetime Doors, Inc., No. 05-2115, 2006 U.S. Dist. LEXIS 6026, 2006 WL 381685 at *17 (E.D. Pa. Feb. 16, 2006).  For these reasons, we conclude that the plaintiff has administratively preserved this claim.

## CONCLUSIONS OF LAW

1.   This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and 42 U.S.C. §2000e, *et. seq.*

2.   Plaintiff has failed to prove his administratively exhausted claims for disparate treatment, retaliation and hostile work environment against Defendant.[17]

3.   Judgment is properly entered in favor of the defendant and against the plaintiff in no amount.

An order follows.

---

[17]   We observe at this juncture that, unfortunately for Plaintiff, his strongest claims against this defendant were those which he did not properly administratively preserve - (1) the failure to promote him along with his white co-workers to the position of Mechanic General in Amarillo in or about May, 2003 and (2) the failure to afford him the same opportunities for overtime in July, 2004.  Quite candidly, we believe that the plaintiff has suffered from numerous instances of workplace discrimination at Boeing. Regrettably and for the reasons which we have discussed in detail above, we are unable to afford Mr. Noel any relief on the basis of the record before us in this case.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EMMANUEL NOEL                : CIVIL ACTION
                                :
      vs.                    :
                                : NO. 06-CV-2673
THE BOEING COMPANY          : 

## ORDER

_____AND NOW, this    7th    day of May, 2008, following Non-Jury Trial in this matter on July 24, 25, 26 and 31, 2007 and for the reasons set forth in the preceding Findings of Fact and Conclusions of Law, it is hereby ORDERED that Judgment is hereby entered in favor of Defendant The Boeing Company and against the Plaintiff, Emmanuel Noel on all of the claims set forth in the Plaintiff's Amended Complaint in no amount.

                                BY THE COURT:

                                s/J. Curtis Joyner_____
                                J. CURTIS JOYNER,       J.